JOHN A. CUNEO, Plaintiff, *v.* ANNA K. CUNEO, Defendant.

Supreme Court, Special Term, New York County, April 24, 1950.

*Millard E. Theodore* for plaintiff.

*Arnold S. Greene* for defendant.

GAVAGAN, J. This is an action to declare the marriage of the parties null and void. They were married in the city of New York on September 4, 1948. The gist of the action is the fraudulent and deceitful representations of the defendant (then a resident and citizen of Karbach, Germany) that plaintiff was the cause of her then pregnancy and was the father of her child. The evidence is clear and, in fact, admitted that plaintiff, while a member of the armed forces of the United States, did cohabit with defendant in Karbach, Germany, within the period of gestation. Upon receipt of defendant's advice of her pregnancy,

plaintiff agreed to arrange to bring her to the United States and, accordingly, she and her child did subsequently arrive and the parties were married when the child was almost two years of age.

Plaintiff, on or about February 19, 1949, brought an action for annulment in this court, alleging fraud in that the defendant represented to the plaintiff that subsequent to her marriage to him she would have normal sexual relations with him and bear him children; and that immediately after marriage she would become an American citizen. That action came to trial and a judgment was rendered in favor of the defendant dismissing the complaint on the merits. Parenthetically, the Trial Justice in rendering his decision stated that the theory of plaintiff's cause of action and his testimony in support thereof taxed credulity; that the real motivation in plaintiff's marriage to the defendant was a high moral principle to right a wrong he felt he did and was based solely on his desire to legitimatize the child he believed the issue of their sexual experience. The Justice took the occasion to compliment plaintiff's sense of honor and thereupon dismissed his cause of action on the merits. Thereafter, the defendant sought support from the plaintiff in the Domestic Relations Court. Because of a conversation between defendant and the social worker of the court, which was communicated to the plaintiff, he demanded and procured a blood grouping test of the defendant, the child and himself. Immediately upon the result of the test the plaintiff brought this action for an annulment, alleging, among other things, that said test negatives beyond peradventure his paternity of the child.

Defendant pleads, besides the general denial, three separate and distinct defenses, i.e.:

(a) that in the first trial the legitimacy of the child, although incidental, was triable and litigable and hence that, by reason of the judgment in the first trial, the legitimacy of said child has been determined and adjudicated and hence that issue is now *res judicata,*

(b) that upon the arrival of the defendant in the United States with said child the plaintiff could have sought and obtained a blood grouping test and satisfied himself of the legitimacy of said child and his failure so to do rendered him guilty of laches in equity and bars relief in this action, and

(c) that the issues relative to the first trial are identical with the issues in this trial and hence the judgment of the first trial is *res judicata* in this action.

The evidence satisfies me beyond a shadow of a doubt that the defendant did represent to plaintiff she was pregnant with his child and that he, believing such representations and relying thereon, married her in order to right a moral wrong and legitimatize the child. I am satisfied by clear and convincing evidence that had defendant not written plaintiff of her condition, both would have remained to this day continents apart.

The decision to be rendered in this action is not only novel but difficult. The defendant is represented by able and astute counsel and, aside from the logic of the defenses, they have been ably presented and brilliantly advocated.

I think it best to dispose of the defenses pleaded and enumerated above, seriatim.

(a) The defense that the legitimacy of the child was determined in the first trial may not be maintained or sustained. True, the subsequent marriage of these parties did legitimatize the child in the sense that it removed from him the stigma of the status of bastardy, but to say that it rendered him the truly legitimate child of these people flies in the face of actualities. The child was conceived and born out of wedlock. True, the great beneficent principles of law and equity, after the marriage of the parties, legitimatize the issue for certain purposes, but neither law nor equity declares that that which was in *esse* long prior to wedlock was conceived and came into *esse* after wedlock.

Neither law nor equity may or can change the actualities of nature. All either can or may do is to lessen, perchance, her inexorable laws. I hold the judgment in the first trial did not legitimatize the child — the marriage of the parties had that effect — but the judgment there in no manner decreed legitimacy, in the sense that that issue is barred in this action.

(b) The second affirmative defense, I hold, is equally without merit. The arrival of the defendant and her child within the United States gave no right to this plaintiff to demand a blood grouping test. The law of this State permits such a test in *an action or proceeding* where the test is relevant to the issue. The plaintiff had no reason to be on guard or to be alerted to the offense. He believed implicitly defendant's representations that he was the father of her child. Neither the occasion, nor his belief, nor the surrounding circumstances required him to assert a legal or equitable right. Furthermore, because of plaintiff's action defendant suffered no change of position. The defense of laches is dismissed without further comment.

The first and third affirmative defenses actually contend that the prior judgment is *res judicata* to the present action. A

judgment in one action is conclusive in a later one, not only as to any matters actually litigated therein, but also as to any that might have been so litigated when the two causes of action have such a measure of identity that a different judgment in the second would destroy or impair rights or interests established by the first (*Cromwell* v. *County of Sac,* 94 U. S. 351; *Reich* v. *Cochran,* 151 N. Y. 122). It is not conclusive, however, to the same extent when the two causes of action are different, not in form only, but in the rights and interests affected (*Baltimore S. S. Co.* v. *Phillips,* 274 U. S. 316, 321). The estoppel is limited in such circumstances to the point actually determined. Such principle is the established law of this State (*Griffen* v. *Keese,* 187 N. Y. 454, 464; *Felix* v. *Devlin,* 50 App. Div. 331-334; *Matter of Hoyt,* 160 N. Y. 607, 618; motion for reargument denied, 161 N. Y. 659).

Applying the principle to the circumstances of this case, may it be said that the first action is identical with the present one in the rights and interests affected? I think not.

The first action was for an annulment for fraud, the genesis of which was the alleged promises to cohabit and bear children. The present action is for an annulment for fraud, but the fraud is entirely different from that alleged in the first action, i.e., a fraudulent representation by the defendant that plaintiff was the father of her unborn child. Applying the above test, we have two causes of action alike in form only but the rights and interests affected are distinct, different and unrelated. The judgment in the first action did not, nor could it decree, that the plaintiff was the natural father of the child. No such decree was asked or sought nor could it have been rendered under the pleadings and issues.

The judgment in the first action declared that the defendant did not promise the plaintiff to cohabit with him and bear him children as a condition precedent to his marrying her — that in this respect no such fraud was practiced. The cause of action in the instant case is entirely different in the rights and interests it seeks adjudicated. A judgment here in favor of the plaintiff is independent of and indifferent to the first or prior judgment. Neither requires the other for support. Both are distinct and separable.

The reason for the rule of *res judicata* " lies in the necessity for preventing vexatious and oppressive litigation, and its purpose is accomplished by forbidding the division of a single cause of action so as to maintain several suits when a single suit will suffice " (*Kennedy* v. *City of New York,* 196 N. Y. 19,

22; *White* v. *Adler,* 289 N. Y. 34). " Implicit in such statements of the rule is an assumption that a plaintiff who has split his causes of action has acted inequitably, knowing that he was causing unnecessary vexation to the defendant, or at least careless whether or not he causes such vexation ". " Of necessity, the splitting up of accounts, or demands, implies, on the part of the suitor, a conscious act, or knowledge " (*Gedney* v. *Gedney,* 160 N. Y. 471, 474; *White* v. *Adler, supra,* p. 42).

When plaintiff commenced the first action he exercised no conscious act or knowledge to split up his demands. At that time he had no knowledge of the fraud alleged in the instant action; hence he could not consciously act thereon. The courts of other jurisdictions have noted that a rigid application of the rule against splitting of causes of action at times would produce injustice. It has been said that exceptions should be recognized " as the evident justice of the particular case requires " (*State ex rel. White Pine Sash Co.* v. *Superior Court for Ferry Co.,* 145 Wash. 576, 579; *United States* v. *Pan-American Petroleum Co.,* 55 F. 2d 753, 776 [C. C. A. 9th]; certiorari denied, 287 U. S. 612).

I hold, therefore, that the judgment in the first cause of action is not *res judicata* to the present action.

We come now to the question: What weight is to be given competent medical expert testimony as to the result of blood grouping tests?

The testimony of both experts and the report of Dr. Lester J. Unger, of the result of his tests, exclude this plaintiff as the father of the defendant's child. The result of the tests, as shown from Exhibit 2 is that under the heading Group and Subgroup the defendant is of type $A_1$, the plaintiff of type $A_1$ and the child $A_2$. There is no exclusion. Under the heading of M-N type the defendant is MN, the plaintiff N, and the child MN; there is no exclusion. However, the Rh-hr type test showed the defendant to be $Rh_1$ hr' positive; the plaintiff $Rh_1$ hr' negative; the child rh negative. Such result, the medical experts testified, wholly excludes the plaintiff as the father of the child.

The testimony in this respect is as follows:

By Dr. Unger:

" Q. What is a homozygous person? A. A homozygous person is a person like this particular child where both the genes are the same, r, r; the lady in question is heterozygous. One gene is Rh positive, and one gene is Rh negative, and that is the crux of the whole situation, because the woman has one gene Rh positive, one gene Rh negative; the man has both genes Rh positive, and the child has both genes rh negative, and one and zero do not add up to 2.

"The Court: * * * what type of blood would a putative father have to have to parent a child of the present child's particular type, from a mother of this defendant's type?

"The Witness: * * * The father would have to be heterozygous and contain at least one rh negative. The father would have to be either rh negative or have one gene rh negative; he must supply an rh negative gene, because the child has two of them. If the father had the same blood as this lady, identical, he could be the father because she has one rh negative gene. If that father had one rh negative gene to help supply the two; however, the father could have been rh negative and could supply two, but she supplied one.

By Dr. Weiner:

"The Court: * * * would the combination of the Rh test of the mother and of the putative father possibly produce that type of blood in that child or produce a child of that type of blood?

"The Witness: It could not, for the reason I gave. The child has two small r genes, one of which obviously came from the mother, but the supposed father did not have any small r genes."

The competent medical testimony is overwhelmingly in favor of the plaintiff in this respect. Dr. Unger and Dr. Weiner testified, in answer to the court's interrogation, that a child of the Rh hr type of blood, as the child in question, could not possibly be the child of the plaintiff. To reject such testimony would be tantamount to rejecting scientific fact. Courts should apply the results of science, when competently obtained, in aid of situations presented. To reject such results is to deny progress. When competently developed and declared, scientific results are entitled to great weight. Accordingly, I hold that the blood grouping tests positively exclude this plaintiff as the father of the child of the defendant; that he married her in reliance upon her false representation that he was said father; that at the time of the marriage he relied in good faith upon defendant's representations; that he had neither the occasion nor the opportunity to prove otherwise; that he was not and could not be charged with laches and that the prior judgment of this court is not *res judicata* to this action.

Judgment is directed in favor of the plaintiff against the defendant upon the merits.